UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH J. MYERS,<br><br>   Plaintiff,<br><br>   v.<br><br>JO ANNE B. BARNHART,<br>Commissioner of the Social<br>Security Administration,<br><br>   Defendant. | No. ED CV 04-994 PJW<br><br>MEMORANDUM OPINION AND ORDER |

I.

INTRODUCTION

Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking reversal of the decision by Defendant Social Security Administration ("Agency") denying Disability Insurance Benefits ("DIB") and Period of Disability ("POD") benefits. Alternatively, she asks the Court to remand the case to the Agency for further proceedings. For the reasons discussed below, the decision of the Agency is AFFIRMED, and this action is DISMISSED WITH PREJUDICE.

## II.

## BACKGROUND

Plaintiff was born on May 31, 1948, and was 54 years-old at the time of the administrative hearing. (AR 15, 50.) She has a high-school education and has past relevant work as a library page, clerk, secretary, receptionist, and cashier. (AR 74.)

Plaintiff filed protectively for DIB and POD benefits on February 14, 2002. (AR 50-52.) Plaintiff alleged disability commencing on the date of her application from a host of mental impairments--including bipolar disorder, depression, and schizophrenia--as well as from diabetes, hypertension, and hypothyroidism. (*See* AR 33.) Plaintiff timely requested a hearing before an administrative law judge ("ALJ") after her claim was denied initially and upon reconsideration. (*See* AR 31-42.)

The hearing was held on April 16, 2003. (AR 347.) Plaintiff appeared with counsel and testified. (*See* AR 349-356.) The ALJ also took the testimony of Ms. Sandra Fioretti, a vocational expert. (*See* AR 356-58.)

At the hearing, Plaintiff admitted that she was working part-time as a library clerk, as she had done for the preceding 12 years. (*See* AR 351, 353.) She stated that she worked 19 hours per week at this job, which--at her hourly pay rate of $8.95--earned her approximately $690 per month. (AR 351, 353.) This job required Plaintiff to answer four phone lines, process new applications, and negotiate fines, although she admitted that she supervised two women, at least one of whom helped her with some of these tasks. (*See* AR 352-53.) She testified that she could not work more hours because "[i]t's just too much stress." (*See* AR 351.) She explained that, in her job, stress

was caused by "patrons that get fussy or cranky or dealing with problems that they have." (AR 351.) The library job was Plaintiff's only source of income. (AR 355.)

As to her lifestyle and activities, Plaintiff stated that she lived alone in her house and did all of her cooking, housework, and laundry by herself. (AR 353-54.) She admitted that she had a valid, unrestricted driver's license and drove a car, but maintained that the farthest she drove was approximately 15 miles, and explained that a "friend from church" drove her to the hearing. (AR 354-56.) Plaintiff added that her pastimes included walking, crocheting, and going to church on Sundays; church services lasted approximately one hour. (AR 354.)

Regarding her impairments, Plaintiff testified that she had been under the care of a psychiatrist since 1970, and stated that she had last been hospitalized in 1977. (AR 350, 354.) She explained that she saw a psychiatrist once per month for approximately 20 minute sessions, primarily to update her doctor as to her progress on her various medications. (*See* AR 355.) Plaintiff also stated that her prescription medications for her psychiatric complaints were "keeping me stable," but insisted that she still fought depression, which made her irritable, anxious, and caused concentration deficits; she added that she still had "a hard time dealing with the public." (*See* AR 350-51.) She claimed that stress made her "want to run and hide." (AR 351.) Additionally, Plaintiff stated that she became "easily frustrated," which meant that she would rush through her job. (AR 352.)

Finally, the ALJ heard testimony from vocational expert Sandra Fioretti. (AR 356-58.) After characterizing Plaintiff's current work as semi-skilled and sedentary, the expert was asked to consider the capacities of the following hypothetical person:

> [C]onsider a person of [Plaintiff's] vocational background, her age, education and work experience, and consider that there's no exertional limit and work is possible at any exertional level. However, consider that the work should involve only simple, routine, repetitive, non-public tasks.

(*See* AR 356.) Ms. Fioretti concluded that this hypothetical person could not perform Plaintiff's current job, but opined that the person could perform several unskilled jobs--including that of office helper, cleaner, hand-packager, and a "wide range of assembly positions"--all of which existed in significant numbers in the regional economy, and each of which "could be learned through demonstration or verbal instruction within 30 days." (*See* AR 356-58.) In response to a question from counsel, however, the vocational expert testified that "if someone is routinely and consistently taking extra breaks, it's going to eliminate work." (AR 358.) The ALJ then adjourned the hearing. (AR 358.)

On May 20, 2003, after analyzing Plaintiff's claims under the Agency's five-step sequential evaluation process, the ALJ issued his decision. (AR 14-18.) At step one, he found that, although Plaintiff's "earnings closely approach work at the substantial gainful activity level by regulatory criteria," she had not engaged in substantial gainful activity since her alleged onset date. (AR 15.) Accordingly, the ALJ proceeded to step two.

At step two, the ALJ stated that Plaintiff "has a very questionably 'severe' mental impairment from a diagnosis of a schizoaffective disorder." (AR 15.) After summarizing the medical evidence of Plaintiff's hypertension, borderline diabetes, and hypothyroidism, however, the ALJ made the step-three determination that Plaintiff's limitations, such as they were, "certainly [did] not approach Listing level severity." (*See* AR 15.) Accordingly, the ALJ proceeded to step four.

At step four, the ALJ assessed Plaintiff's residual functional capacity, finding that she had "at the very least the mental residual functional capacity for simple, routine, repetitive, non-public tasks." (AR 15.) After rejecting Plaintiff's treating physician's opinions about her limitations, and assuming that her job at the library would not be considered substantial gainful activity, the ALJ accepted the vocational expert's testimony that a person with such limitations could perform a range of unskilled jobs--including cleaner, packager, assembler, and office-helper--all of which were available in significant numbers in the local economy. (*See* AR 17.) Accordingly, the ALJ made the step-five conclusion that Plaintiff was not disabled as defined in the Social Security Act (the "Act") at any time through the date of the decision. (AR 17-18.)

Plaintiff timely requested review of the ALJ's decision. (AR 7-10.) The Appeals Council denied review on June 7, 2004, however, and the decision of the ALJ became the final decision of the Agency. (AR 4-6.) Plaintiff then filed her Complaint in this Court. Thereafter, the parties filed a Joint Stipulation ("Joint Stip.").

## III.

### STANDARD OF REVIEW

"Disability" under the applicable statute is defined as the inability to perform any substantial gainful activity because of "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Court may overturn an ALJ's decision that a claimant is not disabled only if the decision is not supported by substantial evidence or is based on legal error. *See Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).) It is "more than a mere scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998), and "does not mean a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

"The Court must uphold the ALJ's conclusion even if the evidence in the record is susceptible to more than one rational interpretation." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). Indeed, if the record evidence can reasonably support either affirming or reversing the Agency's decision, this Court must not substitute its judgment for that of the ALJ. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the ALJ committed error but the error was harmless, reversal is not required. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2003)(applying the harmless error standard).

## IV.

## DISCUSSION

Plaintiff claims that the ALJ erred in his handling of the opinion of her treating physician. Specifically, Plaintiff complains that (1) the ALJ's characterization of the treating-physician rule as "fabricated" by the courts betrays his bias against her, and reveals that he did not show proper deference to the rule, (*see* Joint Stip. at 3-4); and (2) the ALJ made the erroneous factual determination that the treating physician rendered an opinion favorable to Plaintiff as an "egregious accommodation" to her. (*See* Joint Stip. at 6-7.) Although Plaintiff has framed these as separate arguments, each really implicates the same general assignment of error--i.e., that the ALJ did not give the treating physician's opinion proper weight for one reason or another.

A treating physician's opinion on the nature and severity of an impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2). The treating-physician rule requires the ALJ to offer specific and legitimate reasons for rejecting the opinions of treating physicians. *See Holohan v. Massanari*, 246 F.3d 1195, 1202-03 (9th Cir. 2001); *see also Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The treating-physician rule does not, however, require the ALJ to accept a treating physician's opinion which is brief, conclusory, and unsubstantiated by objective medical evidence. *See Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995).

Here, Plaintiff's treating physician was Dr. Alan Compton, M.D., a psychiatrist who treated her mental impairments and saw her on a monthly basis since approximately 1994. (*See* AR 75.) A fair characterization of that medical record is that, although Plaintiff had periodic bouts with anxiety and depression which were exacerbated by her lack of job security,[1] the possibility of being assigned new or additional tasks at work,[2] and occasional conflicts with family,[3] during this entire period her condition was fair or better as long as she continued to take her medications as prescribed.[4] Through the years, Plaintiff reported occasional angry confrontations at work (*see* AR 167, 175, 193, 201, 248, 250); when Depakote was added to her prescription drug regimen in May 2001, however, these episodes ceased. (*See* AR 158, 167.) All the while, Plaintiff worked at least part-

---

[1] *See* AR 256-57 (noting increased anxiety because of job insecurity, which occurred on the dawn of any "new budget year for the Library"); *see also* AR 240 (recording Plaintiff's "preoccup[ation] w/ potential change in her work hrs"); AR 243 (recording Plaintiff's "disappointment that her work may be cut back to 30 hrs a wk" in October 1995).

[2] *See* AR 249 (noting that Plaintiff was "concerned about [the] likelihood that she would have to increase her contact w/ clientele at the library in the near future"); AR 259 (noting Plaintiff was "more anxious the past couple of weeks [...] knowing that she may be asked to start doing some of the computer checkout at the library").

[3] *See* AR 170 (noting Plaintiff was depressed because of "loneliness over the holidays"); *see also* AR 178 (reporting that her depression "[m]ay have been aggravated w/ recent conflict w/ sister"); AR 182, 220 (reporting Plaintiff's anxiety about spending the holidays with her daughter and grandchildren in Utah, a trip she took by bus).

[4] *See* AR 171-72, 174-76, 179-81, 183-84, 187-91, 194-97, 206-16, 221-24, 226-230, 235-38, 258 (noting Plaintiff's positive progress on medication).

time--and perhaps even full-time--at the library.[5]  Despite her occasional work-related anxiety, she survived and even thrived at her job.[6]  By 2001, Dr. Compton reported that Plaintiff was "doing remarkably well."  (AR 168.)  Although Plaintiff expressed some mood fluctuations thereafter--as, for example, when her ex-husband passed away--the general trend showed improvement in her condition.  (*See* AR 154-67.)

By January 8, 2002, Dr. Compton noted that Plaintiff was "[o]verall doing a little better.  Appears brighter.  Reports things are going well at work.  Sleeps well at night.  No difficulty rising.  Is remaining active."  (*See* AR 155.)  In that very same treatment note, however, Dr. Compton wrote:

---

[5]  *See* AR 235-36 (memorializing the full-time status of Plaintiff's job at the library in 1996 and that she "[c]ontinues to work full-time without difficulty"); *see also* AR 252 (noting that Plaintiff was "back to working full-time at the library"); AR 211 (recording that Plaintiff was working 32 hours per week at the library by 1997); AR 160 (noting that Plaintiff was back to working 40 hours per week at the library).

[6]  *See* AR 247 (noting that Plaintiff's fears that she would be asked to do computer checkout at the library had been realized, but observing that she "[i]s now working on the computer at the library w/o difficulty [and] feels good about this"); *see also* AR 246 (noting that Plaintiff "even participated in a social gathering at work"); AR 239 (noting Plaintiff's "concern [...] that she doesn't have enough to do at work and feels guilty about this"); AR 237-38 (noting that Plaintiff was "cheerful" and that her "depression ha[d] lifted" after being told that she could resume working at the library full-time and that she had "been able to work at the front desk at the library for several days w/o difficulty"); AR 202 (noting that Plaintiff worked "w/out difficulty" at the library); AR 195 (recording that Plaintiff was "functioning well" at her job); AR 189 (noting that Plaintiff continued to "do well"; even though work was "busy," she had "recently received a good evaluation" from her superiors); AR 180 (recording Plaintiff's statement that she was "able to assert herself more at work").

9

1         Discussed appropriateness and potential benefit of applying
2         to Social Security.  It had been an on-going struggle for pt
3         to maintain p/t minimum wage employment w/ public library.
4         There have been frequent interpersonal difficulties related
5         to mixed bipolar D/O w/ recurrent paranoia/depression.
6         Urged pt to talk w/ case manager and apply to Social
7         Security.  Her present position is being increasingly filled
8         w/ volunteers.  Do not feel that she would be able to
9         maintain gainful employment if she loses present position.
10        Pt is ineligible for County general medical benefits.

(*See* AR 155.)  And although Dr. Compton reported that Plaintiff was "Doing well.  Conts to work p/t at library.  Good spirits.  Sleeping well" when he saw her on February 19, 2002, he also noted that Plaintiff "[h]as been working with CM applying for SSI." (*See* AR 154.)

It is against this evidentiary backdrop that, on March 19, 2002, Dr. Compton completed a "Medical-Source Statement-Mental" on Plaintiff's behalf.  (*See* AR 280-81.)  In this document, Dr. Compton opined that Plaintiff had only a "fair" ability to understand and remember detailed or complex instructions, attend and concentrate, or work without supervision.  (AR 280.)  Additionally, Dr. Compton found that Plaintiff had a "fair and poor" ability to interact with her coworkers and the public, and only a "fair" ability to interact with her supervisors.  (*See* AR 281.)  Dr. Compton also rated Plaintiff's ability to adapt to changes in the workplace as "poor," but opined that her abilities to be aware of normal hazards, react appropriately, and to use public transportation or travel to unfamiliar places were all "fair."  (AR 281.)  He concluded that Plaintiff's prognosis was "fair to guarded [with] regular medication use."  (AR 281.)

1    In his decision, the ALJ rejected Dr. Compton's opinion.  Very
2 bluntly, he explained his reasoning, which included a direct criticism
3 of the applicable law:

4    I find the [Medical Source Statement] completed by Dr.
5    Compton [. . .] to be an egregious accommodation to
6    [Plaintiff], totally unpersuasive, inconsistent with his own
7    clinical records and with [Plaintiff's] work activity and
8    activities of daily living.  It is in fact a good example of
9    why the so-called treating physician rule fabricated by the
10    courts is unsupported in logic or fact.  The doctor reports
11    [Plaintiff's] ability to interact with the public or co-
12    workers as both fair and poor (take your pick), yet this is
13    exactly what she has been doing on a daily basis since being
14    under Dr. Compton's treatment.  Reportedly her ability to
15    adapt to changes in the workplace is poor, yet according to
16    [Plaintiff's] testimony every workday brought new and
17    varying situations and challenges.  Supposedly, her ability
18    to work without supervision is only fair, yet it is
19    [Plaintiff] who provides the supervision to two other clerks
20    on her shift.  Again, the ability to attend and concentrate
21    is said to be only fair, yet [Plaintiff] attends work 19
22    hours a week and performs a job which[,] according to her[,]
23    obviously requires concentration and which[,] according to
24    the vocational expert[,] was semi-skilled.  Suffice it to
25    say that this form reflects poorly on the completer and has
26    no persuasive value.

27 (*See* AR 19 (citations to record omitted).)  Instead, the ALJ relied
28 upon the opinion of Dr. Jasdeep Aulakh, M.D., a consultative

psychiatric examiner who had opined that plaintiff's mental impairments were treatable--and therefore, non-disabling--with "medication compliance and continued psychosocial support." (*See* AR 16 (citing AR 282-86).)

Plaintiff does not dispute that the law permitted the ALJ to rely on the opinion of the examining physician, even though it conflicted with that of the treating physician. (*See* Joint Stip. at 3-4, 6-7.) Indeed, the Ninth Circuit has held that an ALJ "may reject the opinion of a treating physician in favor of a conflicting opinion of an examining physician," as long as he provides "specific, legitimate reasons for doing so." *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). Additionally, it is beyond dispute that a claimant's mental impairments, insofar as they are controlled by medication, cannot serve as a basis for a finding of disability. *See Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983).

Instead, Plaintiff argues that the ALJ's characterization of the treating-physician rule as one "fabricated by the courts" shows "clear bias" or, at the very least, suggests that he did not apply the rule faithfully. (*See* AR 3-4.) The Court rejects these contentions. "ALJs are presumed to be unbiased, and to rebut this presumption, a plaintiff must show a conflict of interest or some other specific reason for disqualification" or that the ALJ's behavior, in the context of the whole case, was "so extreme as to display clear inability to render fair judgment." *Rollins v. Massanari*, 261 F.3d 853, 857-58 (9th Cir. 2001)(quoting *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999)). Read in context, the ALJ's use of the word "fabricated" to describe the emergence of the treating-physician rule seems imprecise at worst. ALJs are entitled to hold and express their

poor opinion of the law as long as they follow it faithfully: "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women [...] sometimes display" do not establish bias. *See Liteky v. United States*, 510 U.S. 540, 551 (1994).

The Court finds there to be no question that, although this ALJ is an unusually outspoken critic of the treating-physician rule, he nevertheless applied that rule. The ALJ specifically explained that he was rejecting Dr. Compton's opinion because it was inconsistent with his own treatment notes, and because it clashed with Plaintiff's testimony and daily activities. (*See* AR 17.) These are the very sorts of "specific, legitimate reasons" that the treating-physician rule requires ALJs to articulate, if they wish to reject a treating physician's opinion.[7] As the Court's summary of the pertinent portions of the medical record reflects, Dr. Compton's opinion simply cannot be reconciled with the weight of the medical record, and is particularly at odds with the record of Plaintiff's progress on medication immediately before this doctor "urged" her to apply for Social Security benefits. As such, the reasons the ALJ offered for rejecting the treating physician's opinion are supported by substantial evidence.

---

[7] Where a treating physician's conclusions about a claimant's functional limitations "are not supported by h[er] own treatment notes," the ALJ may reject that opinion. *See Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003); *see also Johnson*, 60 F.3d at 1433 (same). Similarly, a treating physician's assessment of a claimant's restrictions may be rejected to the extent it "appear[s] to be inconsistent with the level of activity" the claimant maintains, *see Rollins*, 261 F.3d at 856, or contradicts Plaintiff's testimony. *See Vega v. Callahan*, 975 F.Supp. 1372, 1376 (D. Or. 1997).

Plaintiff also does not dispute that an ALJ is entitled to reject the treating physician's opinion if the doctor becomes an advocate for a claimant. Our circuit has so held. *See Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992). In that vein, this Court has held that an ALJ is permitted to disregard a treating physician's opinion to whatever extent it appears to be an "accommodation in aid of her disability claim." *See Perez v. Chater*, 17 F.Supp.2d 1115, 1123 (C.D. Cal. 1997). Instead, Plaintiff complains that there is no evidence to support the ALJ's inference that Dr. Compton *in fact* completed the Medical Source Statement as an "accommodation" to her or was otherwise biased in her favor. (*See* Joint Stip. at 6-7.) The Court disagrees.

By his own admission, Dr. Compton did *not* "urge" Plaintiff to apply for Social Security benefits because he felt that she was unable to work full-time--the fact that Plaintiff had worked at the library for the entire time that she was in this doctor's care would have made any such belief untenable. Instead, Dr. Compton prompted Plaintiff to file this application because he feared that, if her position at the library was phased out, she would be unable to maintain gainful employment at another job. (*See* AR 154.) In so doing, Dr. Compton overstepped his role. Treating physicians are not qualified to render an opinion touching upon the availability of work. *See Heckler v. Campbell*, 461 U.S. 458, 461 (1983)(describing role of vocational expert as determining whether jobs existed in the national economy that the claimant could perform); *see also Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995)(citing cases for the proposition that an opinion as to whether a claimant can find gainful employment is beyond the province of medical doctors; rather, this determination is

reserved to the vocational expert). Dr. Compton's admission that he "urged" Plaintiff to apply for disability because he made assumptions about her prospects for vocational adjustment gave rise to the inference that the form he completed on her behalf less than two months later was not impartial, but a biased "accommodation" to her. The ALJ may draw reasonable inferences logically flowing from the record. *See Sample v. Schweiker*, 649 F.2d 639, 642 (9th Cir. 1982). In these circumstances, it was reasonable for the ALJ to infer that Dr. Compton had abandoned his role as impartial physician and had, instead, assumed the role of biased advocate.

Although an ALJ's denigration of binding authority may be unseemly, the Ninth Circuit has rejected allegations of bias "when isolated parts of an ALJ's conduct were challenged but the record as a whole showed fundamental fairness for the litigants." *Bayliss v. Barnhart*, 427 F.3d 1211, 1215-16 (9th Cir. 2005). Ultimately, and despite the ALJ's unabashed disdain for the treating-physician rule in general and for Dr. Compton's opinion in particular, it is clear that he applied the law faithfully and fairly. That being so, and because Plaintiff has asserted no other challenges to the ALJ's step-five finding of non-disability, the decision may not be disturbed.

## V.

## CONCLUSION

For the reasons set forth above, this Court finds that the Agency's findings were supported by substantial evidence and were free from material legal error. Accordingly, the Court AFFIRMS the decision of the Agency.

IT IS SO ORDERED.

DATED:    June   6  , 2006.

_____/s/_____
PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Soc Sec\MYERS, S\Memo Opinion.wpd